**Opinion issued December 29, 2020**



**In The**

# Court of Appeals

**For The**

# First District of Texas

—————————————

**NO. 01-19-00078-CV**

—————————————

**MARY MAXEY, INDIVIDUALLY AND AS INITIAL TRUSTEE OF THE BRYAN MAXEY FAMILY, TRUST, AS INITIAL TRUSTEE OF THE CARLOTTA MAXEY MARITAL INCOME TRUST: EXEMPT, AS TRUSTEE OF THE CARLOTTA MAXEY MARITAL INCOME TRUST: NON-EXEMPT, AND AS TRUSTEE OF THE MARY MAXEY DESCENDANT'S TRUST, Appellant**

**V.**

**CAROLYN MAXEY, INDIVIDUALLY, AS SUCCESSOR TRUSTEE OF THE BRYAN MAXEY FAMILY TRUST, AS SUCCESSOR TRUSTEE OF THE CARLOTTA MAXEY MARITAL INCOME TRUST: EXEMPT AND AS TRUSTEE OF THE CAROLYN MAXEY DESCENDANT'S TRUST, Appellee**

---

**On Appeal from the Probate Court No. 1**
**Harris County, Texas**
**Trial Court Case No. 414,060-401**

---

**O P I N I O N**

In this dispute arising out of the probate of her mother's estate, appellee Carolyn Maxey sued her sister, appellant Mary Maxey, for breach of a settlement agreement and sought specific performance of the agreement's terms. After a jury found that Mary breached the settlement and rejected Mary's counterclaims, the trial court entered judgment on the jury verdict, awarding specific performance of release language in the settlement agreement and assessing attorney's fees against Mary. In three issues, Mary contends the trial court erred by (1) determining that the settlement agreement was ambiguous and allowing in parol evidence to assist the jury in interpreting the terms of the agreement; (2) awarding specific performance to Carolyn because she failed to request and secure jury findings on the essential elements of specific performance; and (3) awarding unsegregated attorney's fees to Carolyn.

We reverse and remand.

## Background

Bryan and Carlotta Maxey had two daughters: Carolyn and Mary, the parties to the underlying dispute. Bryan died in 1999, and in his will, he left his property to Carlotta via three trusts. Carolyn serves as trustee for two of the trusts, and Mary serves as trustee for the third trust. Carlotta died in 2011. Her will created two additional trusts—the Mary Maxey Descendant's Trust and the Carolyn Maxey

Descendant's Trust—and provided that these two trusts were to be funded with the assets of the three trusts created in Bryan's will. Carolyn and Mary were appointed as co-executors of Carlotta's estate, but they could not agree on how their parents' assets were to be distributed between the trusts. Mary filed suit against Carolyn in 2015, and Carolyn filed counterclaims against Mary.

## A. The Settlement Agreement

On the morning of the trial on their claims against each other, the sisters executed a document entitled "Binding Irrevocable Settlement Term Sheet" (the Settlement Agreement) on December 12, 2016. In the Settlement Agreement, the sisters agreed to divide the properties owned by the three trusts created in Bryan's will. These properties were listed on two exhibits that were incorporated into the agreement. One of these properties was approximately sixty acres of land located in Marble Falls in Burnet County (the Marble Falls Property). The exhibit provided that the "CAD Value" of the property was $361,914.00, and that, upon partition of the property, both the Mary Maxey Trust and the Carolyn Maxey Trust would receive parcels valued at $180,957.00. A notation on the exhibit stated, with respect to this property, "Mary Maxey Trust to receive West 50% and Carolyn Maxey Trust to receive East 50%." The Agreement required Carolyn to partition this property and to handle installation of a fence on the property.

The sisters agreed that "all property shall be deeded by" January 30, 2017. Mary agreed to provide Carolyn a full accounting of Carlotta's estate within sixty days of the agreement. The sisters agreed to release all claims relating to the trusts created in Bryan's will and relating to his estate, but they did not agree to "release claims relating to the administration and/or settlement of" Carlotta's estate. The Settlement Agreement also included the following provisions:

10. The parties will enter into a final release and settlement agreement consistent with the foregoing material terms and will submit a final judgment in Cause No. 414,060-401 [the underlying cause], consistent with this agreement that releases and discharges Carolyn and Mary as trustees of the [three trusts created in Bryan's will].

. . . .

13. The parties agree that this Binding Irrevocable Settlement Term Sheet contains all material terms and that the parties shall be entitled to judgment in Texas.

14. The parties agree that time is of the essence and that they will cooperate to effectuate the terms of this agreement, including the execution of all anticipated documents, entry of all judgments and delivery of all payments, by 1/30/2017.

15. **THIS BINDING IRREVOCABLE SETTLEMENT AGREEMENT IS NOT SUBJECT TO REVOCATION AND IS BINDING ON ALL PARTIES. EACH PARTY TO THIS AGREEMENT IS ENTITLED TO REQUEST JUDGMENT ON THE TERMS OF THE BINDING IRREVOCABLE SETTLEMENT AGREEMENT CONTAINED HEREIN.**

4

The Agreement also included a provision stating, in all caps, that it "may not be contradicted by evidence of prior, contemporaneous, or subsequent oral or written agreements between or among one or more of the parties hereto."

## B.    The Underlying Claims

In May 2017, Carolyn, who was originally the defendant when litigation commenced over Carlotta's estate, filed a first supplemental answer and counterclaim.[1] Carolyn alleged that, contrary to the terms of the Settlement Agreement, Mary had not conveyed two properties[2] to her. She also alleged that Mary had filed incorrect tax returns for Carlotta's estate, had not filed final tax returns for the trust for which Mary was trustee, had not delivered an agreed order of dismissal, and had failed to provide a sufficient accounting of Carlotta's estate. Carolyn sued Mary for breach of the Settlement Agreement for her failure to transfer certain pieces of real property and sought specific performance of the agreement. Carolyn also noted that Mary had provided Carolyn with an accounting, but Carolyn set out ten specific objections to that accounting and claimed that the accounting was

---

[1]    During the litigation, the trial court re-aligned the parties and Carolyn became the plaintiff.

[2]    The Agreement also provided that Mary was to convey to Carolyn seven lots in Marble Falls known as the Collier Lots as well as a property in Galveston County known as the Kohfeldts Property. Mary transferred the Kohfeldts Property to Carolyn during the pendency of the litigation. At trial, Carolyn acknowledged that she had received a deed to the Collier Lots, and she agreed with her counsel that she had no further complaint concerning that property.

5

insufficient. Carolyn later filed an amended pleading in which she sought declaratory relief, including a declaration that the Settlement Agreement was binding and enforceable. Carolyn also sought attorney's fees.

Mary generally denied the allegations in Carolyn's amended pleading and asserted multiple defenses and affirmative defenses. Mary also asserted multiple causes of action against Carolyn, including breach of contract, promissory estoppel, unjust enrichment, suit to quiet title, trespass to real property, negligent misrepresentation, fraud, and breach of fiduciary duty. With respect to her breach of contract cause of action, Mary alleged that Carolyn breached the Settlement Agreement by dividing the Marble Falls Property "in a way that was neither equal in value nor acreage, as Carolyn deeded herself a greater share of this property." Mary sought damages and specific performance "of reforming the conveyance of the 60-acre tract in Marble Falls to comply with the terms of the settlement."

Mary moved for partial summary judgment on her claim for breach of the Settlement Agreement. Mary argued that, under the agreement, Carolyn was required to divide the Marble Falls Property into two parcels of equal value, with Mary receiving the "West 50%" and Carolyn receiving the "East 50%." Mary argued that Carolyn breached the Settlement Agreement by conveying to herself approximately 31.939 acres, or more than 50% of the Marble Falls Property, "leaving Mary with less land than she bargained for under the settlement." Mary

6

argued that Carolyn breached the Settlement Agreement as a matter of law, but she acknowledged that "the precise amount of damages [she] is entitled to under this claim is a fact issue that a jury must resolve."

In response, Carolyn argued that partial summary judgment was not proper because, among other things, a disagreement existed "over the language of the Agreement as to what portion of the real property was to be conveyed." Carolyn argued that she had had the Marble Falls Property surveyed and platted into two separate tracts (the Brookes Baker Survey) and that both parties had used this survey "during settlement negotiations to supply meaning to the terms of the Agreement specifying the property division." The Brookes Baker Survey divided the Marble Falls Property into east and west tracts of unequal size and unequal value. The Survey favored Carolyn as to both acreage and value of the property.

Carolyn argued that without reference to this survey the Settlement Agreement was ambiguous. She argued that the Marble Falls Property was an "irregular plot of land with limited access to the road and portions of terrain that inhibit the marketability of the land," that the Brookes Baker Survey took these irregularities into account when dividing the property, and that the parties agreed to this division while negotiating the Settlement Agreement. Carolyn argued that extrinsic evidence, specifically the Brookes Baker Survey, was necessary to

determine what the parties intended by "West 50%" and "East 50%" of the Marble Falls Property and therefore summary judgment was improper.

Mary objected to the Brookes Baker Survey and several other of Carolyn's summary judgment exhibits, arguing that admission of these exhibits would vary the terms of the Settlement Agreement and would therefore violate the parol evidence rule. Mary also argued that the Settlement Agreement was not ambiguous, pointing out that Carolyn had not offered "another reasonable interpretation of the settlement's 50% language." She argued that, instead, the Settlement Agreement's language providing that Mary would receive the "West 50%" and Carolyn the "East 50%" of the Marble Falls Property could be given definite legal meaning and was therefore unambiguous. Mary disputed Carolyn's assertion that she and Carolyn had agreed to use the Brookes Baker Survey to divide the Property.

The trial court denied Mary's motion for partial summary judgment and set the case for trial.

## C.    *The Jury Trial*

Before trial, both parties filed motions in limine. Mary's motion requested that the trial court grant a motion in limine with respect to the following matters, among others:

> 19.    Any statement, testimony, argument, or other evidence from Carolyn or her attorneys or witnesses that the settlement agreement involved in this case or any of its terms [is] ambiguous since Carolyn testified [in her deposition] that the agreement is unambiguous.

8

20. Any statement, testimony, argument, or other evidence from Carolyn or her attorneys or witnesses with regard to any settlement negotiations or terms that were not written into the terms of the settlement agreement involved in this case, including any evidence relating to any survey or discussion of same. Such evidence is barred by the parol-evidence rule.

21. Any statement, testimony, argument, or other evidence from Carolyn or her attorneys or witnesses with regard to any difficulty partitioning the Marble Falls 60 acres equally in terms of acreage or value. Carolyn failed to properly designate any expert witness qualified to testify about such matters or disclose any mental impressions or the bases of any opinions about such matters. . . . Such evidence is also barred by the parol-evidence rule to vary, alter, or supplement the terms of the settlement agreement at issue in this case.

(Internal citations omitted.)

Carolyn objected to these portions of Mary's motion in limine and argued that the parol evidence rule does not prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding execution of the contract in order to aid in construing the contract's language.

On July 23, 2018, the trial court granted Mary's motion in limine on each of the three above-mentioned matters, among others. After a jury had been selected, but before the parties made their opening statements, the parties discussed the matters again with the trial court. The trial court determined that the Settlement Agreement—specifically, the language stating that Mary would receive the "West 50%" of the Marble Falls Property and Carolyn would receive the "East 50%"—was ambiguous, and the court ruled that it would allow the jury to "hear the context" of

9

what the parties considered when negotiating the Settlement Agreement, including the Brookes Baker Survey. The trial court agreed with Carolyn that the lawyers who represented the sisters during the negotiation of the Settlement Agreement could testify concerning that process.

At trial, David Bolton, a real estate appraiser, testified as to the division of the Marble Falls Property under the Brookes Baker Survey. He testified that Mary's tract of the Property was 27.438 acres and Carolyn's tract was 31.939 acres. Bolton valued the tracts as of December 28, 2016, the date Carolyn divided the property. He valued Mary's tract at $935,000 and Carolyn's tract at $1,180,000. Bolton also testified that the property could have been divided in a way that "equalizes the interior lake area" and that would have divided the property equally.

Sarah Pacheco, who represented Carolyn in the initial phases of the lawsuit and up through the execution of the Settlement Agreement, testified regarding that Agreement. Pacheco testified that the purpose of the Settlement Agreement was to promptly enter judgment dividing the assets in the trusts created under Bryan's will "with no co-ownership" of the assets. She testified that, with respect to the Marble Falls Property, the Settlement Agreement did not address whether future surveys of the property would be conducted or whether appraisers would be hired in the future to appraise the property. Nor did it address what methodology would be used to determine equal value of the two parcels of the property. Pacheco stated that she and

10

Mary's former counsel had discussed how to define "West 50%" and "East 50%." She testified:

> There was a partition or a survey [the Brookes Baker Survey] that was done right before [the December 2016] trial [setting] and it kind of divides the property into an east and a west or right and a left but there was a line through it and the goal was to agree to the sides and that was the sides of that survey or partition . . . .

She agreed with Carolyn's current counsel that the Brookes Baker Survey formed the basis of the agreement between the parties as to what "West 50%" and "East 50%" in the Settlement Agreement mean. She further agreed on cross-examination that the Brookes Baker Survey was not attached as an exhibit to the Settlement Agreement, even though the Agreement included other exhibits.

Pacheco testified that the parties did not agree that an appraisal of the two tracts in the Survey would occur at a later date to determine that the tracts were of equal value. She testified that Mary proposed an appraisal or valuation of the tracts but Carolyn refused, wanting the division of the properties to be completed as quickly as possible.

Jason Ostrom, Mary's former counsel, likewise testified concerning negotiation of the Settlement Agreement. Ostrom testified that the agreement concerning the Marble Falls Property was that the "property will be divided in half with each Trust receiving an equal value" and that "[e]ach Trust here is allocated the same value." He agreed that the Settlement Agreement made no provision for

11

redoing the division if the two tracts of the property were not of equal value. He also agreed that, prior to execution of the Settlement Agreement, he had seen a survey dividing the Marble Falls Property into two tracts—the Brookes Baker Survey. He testified that he had proposed dividing the property based on that survey and then, after an appraisal of the tracts, equalizing the value of the tracts through a cash payment. His proposal, however, was rejected by Carolyn. Ostrom also agreed that, in April 2017, Carolyn's counsel sent him a proposed order dismissing the claims in the lawsuit. Ostrom did not recall responding to Carolyn's counsel concerning this proposed order or signing that order.

On cross-examination by Mary's current counsel, Ostrom testified that the purpose of the Settlement Agreement was "to split up the Trusts as evenly as possible between Carolyn and Mary in order to avoid the trial that was about to take place." He stated that, in negotiating the agreement, the attorneys "were trying to equalize the value as best we could." With respect to the Marble Falls Property, Ostrom testified, "We divided it equally between Mary and Carolyn's Trust." He also testified that Mary would not have allowed the Brookes Baker Survey to "be a controlling document" relating to the Settlement Agreement because she disagreed with how the survey divided the property.[3] Ostrom also agreed that he never signed,

---

[3] On re-direct examination, Ostrom stated, "[M]y client agreed to take that designated half so long as it was equal value. That's what she was agreeing to."

on behalf of Mary, the proposed order of dismissal because Mary believed that Carolyn had not fulfilled her obligations under the Settlement Agreement.

During Carolyn's testimony, her counsel asked whether the parties intended to divide the properties owned by the trusts equally, such that "each side would get an absolute equal value of property." Carolyn responded, "As best as possible." She acknowledged that the schedules attached as exhibits to the Settlement Agreement reflected a difference in value between the properties that she was to receive versus the properties that Mary was to receive. Carolyn testified that after execution of the Settlement Agreement, she conveyed a tract of the Marble Falls Property to Mary in December 2016. When asked how she divided the Marble Falls Property, Carolyn responded, "I had the surveyor divide it as equally as possible." She testified that Mary had a copy of the Brookes Baker Survey before they signed the Settlement Agreement.

Carolyn testified that the Colorado River forms the northern boundary of the Marble Falls Property. At one point, Bryan used the property for gravel mining, and now the property has a gravel pit that has been filled with water to form a lake. A road runs along the western boundary of the property, and Carolyn testified that because Mary received the western half of the property Carolyn did not have access to that road. Carolyn testified that the property is used for cattle grazing and that it does not have any improvements or municipal services. When asked to describe the

13

topography of the property, Carolyn stated, "It's all over the place. A lot of it is in the floodplain. I think there is a portion that's not in the floodplain. The rest slopes down and is all covered in floodplain."

The trial court admitted an e-mail exchange between the sisters that occurred in late December 2016, after execution of the Settlement Agreement. Mary asked Carolyn for "the specific plat line for the fence" Carolyn intended to put on the Marble Falls Property to divide their two tracts. Carolyn responded that she had "provided the survey plat lines last month" and that Mary's attorney had the property division for the Marble Falls Property, referring to the Brookes Baker Survey. Carolyn did not receive any response from Mary objecting to using the Brookes Baker Survey to divide the property, nor did she receive a survey or proposed property division from Mary. However, in an email exchange that occurred in February 2017, concerning construction of the fence on the Marble Falls Property, Mary told Carolyn, "Do not move forward with this. We do not agree with this nor do we agree with the division of the property."

Carolyn's counsel asked, "What was your understanding of the Settlement Agreement, how [the Marble Falls Property was] to be divided?" Carolyn responded, "As the survey had divided them." Carolyn also testified that she had asked the surveyors, in dividing the property, "to do equal highway footage, equal lake front footage and equal land," and Carolyn believed the Brookes Baker Survey met those

14

requirements. She testified that when the Settlement Agreement referred to the "West 50%" and "East 50%" of the property, her understanding was that meant the Brookes Baker Survey.

Carolyn testified that the fence on the Marble Falls Property was completed around March 2017 and that, except for distributing "whatever remaining cash there was," she believed she had fulfilled all of her obligations under the Settlement Agreement. She requested that Mary complete her duties and have the underlying litigation dismissed. She agreed that she had her counsel deliver a proposed order of dismissal to Mary's counsel, but she never received a response from Mary or her counsel. When asked what relief Carolyn sought from the jury, Carolyn stated that she wanted her attorney's fees, a finding that she had complied with the Settlement Agreement, and dismissal of the case pursuant to the Settlement Agreement.

Mary testified that she received and studied the Brookes Baker Survey before she signed the Settlement Agreement and that she told Ostrom, her attorney at the time, that she could not agree to the Settlement Agreement if it was based on this survey. She did not agree that "West 50%" and "East 50%" as used in the Settlement Agreement referred to the Brookes Baker Survey, and she testified that the survey "was not any part of the settlement." She agreed with Carolyn's counsel that, even if the acreage of the two tracts of the Marble Falls Property was unequal, she would not have a complaint if the values of the two tracts had been equal, but they were

15

not. Her complaint with the way Carolyn had divided the property was that Carolyn received more acreage and her tract had a higher value. Mary further agreed with Carolyn's counsel that the earliest time she told Carolyn that she did not agree with the division of the Marble Falls Property was in February 2017, when Carolyn contacted her about constructing a fence on the property. She also agreed that there was no "natural division" of the property into an east half and a west half, and therefore dividing the property was a judgment call that involves considering several factors including river access, road access, lake access, and how much of the property was located in the floodplain, but she did not believe that Carolyn made a fair judgment in dividing the property.

Carolyn's attorney testified concerning attorney's fees, and the trial court admitted all of the billing records sent to Carolyn. Carolyn requested that the jury award her $148,025 for attorney's fees through the time of trial and $80,000 for conditional appellate attorney's fees. Mary cross-examined Carolyn's counsel about attorney's fees and pointed out that, initially, Carolyn had asserted several ways in which Mary allegedly breached the Settlement Agreement but only proceeded to trial on one of those ways—failure to obtain an order of dismissal from the trial court—but counsel had not attempted to segregate the fees related to the claims that were not pursued at trial. Carolyn's counsel responded that "[t]he additional time spent on those matters were nominal" and that "the primary amount of time" was

16

spent defending against Mary's affirmative claims, which was interrelated with Carolyn's remaining affirmative claim.

Question Number One of the jury charge asked, "Did Carolyn and Mary agree to divide the Marble Falls 60 acres pursuant to the Survey?" The charge defined "Survey" as the Brookes Baker Survey. This question instructed the jury as follows: "You must decide the intent of the parties at the time of the Settlement Agreement. Consider all the facts and circumstances surrounding the making of the Settlement Agreement, the interpretation placed on the Settlement Agreement by the parties, and the conduct of the parties." The jury answered "yes" to this question.

In Question Number Two, the jury found that Carolyn did not fail to comply with the Settlement Agreement with respect to the Marble Falls Property. In Question Number Four, the jury found that Mary failed to comply with the Settlement Agreement "with respect to the 'Agreed Order of Dismissal.'" And in Question Number Five, the jury found that Mary's failure to comply was not excused. In Question Number Nine, the jury found that "a reasonable fee for the necessary services of Carolyn's attorney" was $148,025 "[f]or representation through trial and the completion of proceedings in the trial court." The jury also found that a total of $80,000 in appellate attorney's fees was reasonable and necessary. The jury further found that Carolyn did not make a negligent

17

misrepresentation to Mary, did not commit fraud against Mary, and did not breach her fiduciary duties to Mary.[4]

## D.    The Post-Trial Proceedings

After trial, Carolyn moved for entry of judgment on the jury verdict, requesting that the trial court dismiss all claims "as a matter of specific performance of the settlement agreement" and award her attorney's fees. Mary objected and argued, among other things, that Carolyn did not request a jury question on specific performance and obtained no jury findings relating to specific performance, such as whether Carolyn was ready, willing, and able to perform under the Settlement Agreement at all relevant times. Mary argued that, as a result of that failure, the trial court could not award specific performance or attorney's fees to Carolyn. Mary also argued that Carolyn was not entitled to specific performance as an equitable remedy for breach of contract because Carolyn could not establish that there was no adequate remedy at law due to the availability of money damages. She further argued that the trial evidence was legally and factually insufficient to support the amount of attorney's fees awarded to Carolyn, contending that the evidence was insufficient to support a determination that the work performed by her attorneys was reasonable and necessary. Mary also argued that Carolyn failed to segregate her attorney's fees.

---

[4]    Mary asserts no complaints concerning these findings on appeal.

On October 31, 2018, the trial court signed a final judgment. The judgment stated:

> IT IS ORDERED, ADJUDGED AND DECREED that Plaintiff Carolyn Maxey have and recover judgment against Defendant Mary Maxey for Defendant's breach of and failure to comply with the Settlement Agreement (as that term was defined in the Jury Charge) and dismissal of claims that in any way relate to the settlement agreement between Carolyn Maxey and Mary Maxey.
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Carolyn Maxey have and recover judgment against Defendant Mary Maxey for specific performance of the Settlement Agreement which Settlement Agreement provided for full, final and complete release and discharge of all claims asserted between Plaintiff Carolyn Maxey and Defendant Mary Maxey prior to the entry of the settlement agreement and dismissal of those claims that were bifurcated[5] and not tried per the Court's order of October 12, 2017.
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that any relief sought by Defendant Mary Maxey against Plaintiff Carolyn Maxey is denied.

The judgment awarded Carolyn attorney's fees in the amount of $148,025 "for representation through trial and the completion of proceedings in this Court" and awarded a total of $80,000 in conditional appellate attorney's fees.

Mary moved for a new trial. Mary argued that Carolyn was not entitled to recover attorney's fees because Carolyn (1) did not obtain necessary jury findings

---

[5] Before the case went to trial, the trial court signed an order bifurcating trial of the claims. The court ordered that the first trial would cover only claims relating to the Settlement Agreement and, if necessary, the second trial would cover all other claims between the parties arising out of the administration of their parents' estates. The trial concerning the Settlement Agreement resolved all claims between the parties.

19

relevant to specific performance; (2) failed to segregate recoverable and unrecoverable attorney's fees; and (3) did not present legally sufficient proof that her attorney's fees were reasonable and necessary. Mary also argued that the trial court erred by allowing Carolyn to introduce extrinsic evidence—including the Brookes Baker Survey—to show how the parties had intended to divide the Marble Falls Property. The trial court denied Mary's motion for new trial. This appeal followed.

## Parol Evidence Rule

In her first issue, Mary contends that the trial court erred by admitting parol evidence and allowing the jury to interpret the terms of the Settlement Agreement, which was unambiguous. Specifically, Mary argues that the trial court erred by determining that the Settlement Agreement was ambiguous and that the trial court should not have allowed parol evidence—such as the Brookes Baker Survey and testimony from the attorneys involved in negotiating the Settlement Agreement—to construe the meaning of the Settlement Agreement.

### A. *Standard of Review and Governing Law*

When construing a contract, we must look to the language of the parties' agreement. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). We must give effect to the parties' intentions as expressed in their agreement. *Id.*; *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d

882, 888 (Tex. 2019) (stating that "primary objective" when construing contract is "to give effect to the written expression of the parties' intent"). When discerning the contracting parties' intent, we examine the entire agreement and give effect to each provision so that none is rendered meaningless. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). We give contract terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Id.* (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)). We do not give any single provision, taken alone, controlling effect; rather, we consider all provisions with reference to the entire instrument. *Id.* (quoting *Tawes*, 340 S.W.3d at 425). "A contract's plain language controls, not 'what one side or the other alleges they intended to say but did not.'" *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). We construe contracts under a de novo standard of review. *Barrow-Shaver Res.*, 590 S.W.3d at 479.

If a written instrument, such as a contract, is worded in such a way that it can be given a definite or certain legal meaning, the contract is not ambiguous and courts construe the contract as a matter of law. *See id.*; *Union Pac. R.R. Co. v. Ameriton Props., Inc.*, 448 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Courts enforce

an unambiguous contract as written and will not receive parol evidence "for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Union Pac. R.R.*, 448 S.W.3d at 677–78 (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam)). A trial court errs when it submits an unambiguous contract to the jury rather than construing it as a matter of law. *Barrow-Shaver Res.*, 590 S.W.3d at 480.

"Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'" *David J. Sacks, P.C.*, 266 S.W.3d at 450–51 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam)). If the contract contains two or more reasonable interpretations, the contract is ambiguous, and a fact issue exists regarding the parties' intent. *Barrow-Shaver Res.*, 590 S.W.3d at 479; *Title Res. Guar. Co. v. Lighthouse Church & Ministries*, 589 S.W.3d 226, 232 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (stating that ambiguity in contract arises only after application of established rules of interpretation leaves contractual language susceptible to more than one reasonable meaning). When a court determines that a contract is ambiguous, extraneous evidence may be admitted to help determine the language's meaning. *Barrow-Shaver Res.*, 590 S.W.3d at 480.

"Contract language is not ambiguous simply because it is unclear or because the parties 'assert forceful and diametrically opposing interpretations.'" *Title Res. Guar.*, 589 S.W.3d at 232 (quoting *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (orig. proceeding)); *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) ("Lack of clarity does not create an ambiguity, and '[n]ot every difference in the interpretation of a contract . . . amounts to an ambiguity.'") (quoting *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994)). Whether a contract is ambiguous is a question of law that we review de novo. *First Bank v. Brumitt*, 519 S.W.3d 95, 105 (Tex. 2017); *Union Pac. R.R.*, 448 S.W.3d at 678. This question "must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011) (quoting *David J. Sacks, P.C.*, 266 S.W.3d at 451).

The parol evidence rule is a rule of substantive law. *S. Green Builders, LP v. Cleveland*, 558 S.W.3d 251, 258 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The rule applies "when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *see West v. Quintanilla*, 573 S.W.3d 237, 243 (Tex. 2019) ("When parties have entered into a valid, written, integrated contract, the parol evidence rule precludes

23

enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with the written contract."). "[A] written instrument presumes that all prior agreements relating to the transaction have been merged into it and will be enforced as written and cannot be added to, varied, or contradicted by parol testimony." *S. Green Builders*, 558 S.W.3d at 258. The rule does not, however, prohibit consideration of surrounding circumstances that "inform, rather than vary from or contradict, the contract text." *Houston Expl.*, 352 S.W.3d at 469; *Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451 ("Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.").

In recent years, the Texas Supreme Court has clarified when courts may consider surrounding circumstances and parol evidence when construing a contract. Courts may consider facts and circumstances including "the commercial or other setting in which the contract was negotiated and other *objectively determinable factors* that give context to the parties' transaction." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014) (emphasis added); *Houston Expl.*, 352 S.W.3d at 469; *see also Kachina Pipeline*, 471 S.W.3d at 450 ("But while evidence of circumstances can be used to 'inform the contract text and render it capable of only one meaning,' extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity.") (quoting *Americo Life*, 440 S.W.3d at 22).

"Because objective intent controls the inquiry, only circumstantial evidence that is objective in nature may be consulted." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 768 (Tex. 2018). These "objectively determinable factors" can include, for example, "[t]he manner in which the insurance policy [at issue in the particular case] was negotiated in the [relevant] market" because those circumstances were "crucial to understanding [the policy's] terms." *See, e.g.*, *Houston Expl.*, 352 S.W.3d at 469–70; *Murphy Expl. & Prod. Co.—USA v. Adams*, 560 S.W.3d 105, 110 (Tex. 2018) (considering "realities" of horizontal shale drilling as part of "facts and circumstances surrounding the contract's execution" that "may inform" court's construction of lease language); *Tawes*, 340 S.W.3d at 426 (considering "customary purpose" in oil and gas industry for using joint operating agreements when determining whether parties intended for royalty provision to benefit third parties).

The Texas Supreme Court has stated:

> If a court concludes that the parties' contract is unambiguous, it may still consider the surrounding "facts and circumstances," but "simply [as] an aid in the construction of the contract's language." In other words, the parol-evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." Courts may consider such contextual evidence "in determining the parties' intent *as expressed in the agreement*, but the court must determine the parties' expressed intent. *Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated*." . . . In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous language, circumstances surrounding the formation of a contract may inform the meaning of a

25

contract's unambiguous language. *But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say*.

*First Bank*, 519 S.W.3d at 110 (emphasis added) (internal citations omitted); *see Pathfinder Oil & Gas*, 574 S.W.3d at 889 ("Circumstantial evidence is merely 'an aid in the construction of the contract's language' and may only be used to give the contract a meaning consistent with that to which its terms are reasonably susceptible.") (quoting *URI*, 543 S.W.3d at 765).

"Objective manifestations of intent control, not 'what one side or the other alleged they intended to say but did not.'" *URI*, 543 S.W.3d at 763–64 (quoting *Gilbert Tex. Constr.*, 327 S.W.3d at 127); *see Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 749 (Tex. 2020) ("The parol evidence rule prohibits us from relying on such evidence to 'create ambiguity in the contract's text,' to 'augment, alter, or contradict the terms of an unambiguous contract,' to 'show that the parties probably meant, or could have meant, something other than what their agreement stated,' or to 'make the language say what it unambiguously does not say.'") (internal citations omitted). We cannot rewrite a contract or add to its language "under the guise of interpreting it." *Abdullatif v. Choudhri*, 561 S.W.3d 590, 602 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *S. Green Builders*, 558 S.W.3d at 259 (stating that trial court "could not rely on extrinsic evidence to create an intent that the contract itself does not express").

## B.    *Analysis*

Prior to the Settlement Agreement, the Marble Falls Property was owned by a trust created in Bryan's will, and Carolyn was the trustee of this trust. In the Settlement Agreement, the sisters agreed that properties owned by this particular trust "shall be divided, as indicated on the Agreed Settlement Distribution Schedule, attached hereto as Exhibit A." Exhibit A to the Settlement Agreement identified the Marble Falls property, stated that the appraisal district had valued the property at $361,914, and provided that the Mary Maxey Trust was to receive a tract worth half of that value and that the Carolyn Maxey Trust was to receive a tract worth half of that value. Exhibit A also included a notation that stated, "Mary Maxey Trust to receive West 50% and Carolyn Maxey Trust to receive East 50%."

The trial court ruled that the Settlement Agreement was "ambiguous as to the sixty-acre tract of land and its distribution and division," and it allowed the introduction of parol evidence to aid the jury in its interpretation of the Settlement Agreement. Specifically, the trial court admitted a copy of the Brookes Baker Survey, which divided the land unequally in Carolyn's favor in terms of both acreage and value. The court then allowed Carolyn and her former attorney to testify to their belief that the Settlement Agreement required dividing the property into two tracts as set out in the survey. Mary and her former attorney were allowed to testify that they had received a copy of the Brookes Baker Survey before executing the

Settlement Agreement, but they did not agree to the division of the property as set out in that survey and that, if that survey had formed the basis of the Settlement Agreement, Mary would not have agreed to it.

We disagree with the trial court that the Settlement Agreement is ambiguous. The Settlement Agreement identifies the Marble Falls Property, provides that it is to be divided in such a way that Mary's trust receives a tract worth one-half of the value of the entire property and Carolyn's trust receives a tract worth one-half of the value of the entire property, and further provides that Mary's trust is to receive the "West 50%" and Carolyn's trust the "East 50%." As Mary argues, this language is clear and can be given definite meaning: the sisters agreed that the Marble Falls Property was to be divided into two tracts, equivalent in value, and that Mary would receive the western tract and Carolyn the eastern tract. This language is not reasonably susceptible to more than one meaning. *See Barrow-Shaver Res.*, 590 S.W.3d at 479 (stating that contract is unambiguous if language can be given certain or definite legal meaning, but if language is subject to two or more reasonable interpretations, contract is ambiguous and fact issue exists concerning parties' intent); *cf. Toler v. Sanders*, 371 S.W.3d 477, 481 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (stating that phrase "50% of the community property of Ron's Rail Road Retirement Benefits" in mediated settlement agreement is not reasonably susceptible to more than one meaning and unambiguously entitles wife "to that share of all of the

28

retirement benefits earned for the specified period under the railroad retirement plan").

To the extent the trial court ruled that the Settlement Agreement was ambiguous because it was silent on precisely *how* the Marble Falls Property was to be divided and did not set out metes and bounds for the two specific tracts, we note that our sister courts have repeatedly held that ambiguity in contract language is not to be confused with silence. *See Providence Land Servs., LLC v. Jones*, 353 S.W.3d 538, 543 (Tex. App.—Eastland 2011, no pet.); *E.P. Towne Ctr. Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 122 (Tex. App.—El Paso 2007, no pet.) ("There is a significant legal difference between a contract's silence—i.e., its failure to address a particular issue—and the presence of an ambiguity in the contract language."); *Hewlett-Packard Co. v. Benchmark Elecs., Inc.*, 142 S.W.3d 554, 561 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Lidawi v. Progressive Cty. Mut. Ins. Co.*, 112 S.W.3d 725, 731 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *Embrey v. Royal Indemn. Co.*, 986 S.W.2d 729, 731 n.2 (Tex. App.—Dallas 1999), *aff'd*, 22 S.W.3d 414 (Tex. 2000).

An ambiguity results when the intention of the parties is expressed in language that is susceptible to more than one meaning. *Providence Land Servs.*, 353 S.W.3d at 543. In contrast, when a contract is silent, the question "is not one of interpreting the language but, rather, one of determining its effect." *Id.*; *E.P. Towne Ctr.*

29

*Partners*, 242 S.W.3d at 122 ("When a contract is silent on a particular issue, the court must determine the effect of the silence."). Courts may not and will not rewrite contracts to insert provisions that the parties could have included, but did not, and that are not essential to the construction of the language of the contract. *Robinson v. Home Owners Mgmt. Enters., Inc.*, 549 S.W.3d 226, 240 (Tex. App.—Fort Worth 2018), *aff'd*, 590 S.W.3d 518 (Tex. 2019); *Providence Land Servs.*, 353 S.W.3d at 543 ("Courts are without authority to supply the missing terms of a contract which the parties themselves had either not seen fit to place in their agreement, or which they omitted to agree upon.") (quoting *Dempsey v. King*, 662 S.W.2d 725, 728 (Tex. App.—Austin 1983, writ dism'd)); *Hewlett-Packard*, 142 S.W.3d at 561 ("A jury may not be called upon to construe the legal effect of an agreement or to supply an essential term upon which the parties did not mutually agree.").

The fact that the Settlement Agreement did not specify, through metes and bounds or some other method, how Carolyn was to divide the Marble Falls Property does not make the language in the Settlement Agreement ambiguous. The agreement provided that the property was to be divided into two tracts of equivalent value, with Mary receiving the western tract and Carolyn receiving the eastern tract. As we have held, this language can be given certain and definite legal meaning, and it is not susceptible to more than one reasonable interpretation. We therefore conclude that the Settlement Agreement is not ambiguous. *See Barrow-Shaver Res.*, 590 S.W.3d

30

at 479 (stating that contract is unambiguous if language can be given certain or definite legal meaning, but if language is subject to two or more reasonable interpretations, contract is ambiguous and fact issue exists concerning parties' intent).

Carolyn argues that, even if the Settlement Agreement's language is unambiguous, the trial court properly allowed the admission of the Brookes Baker Survey and the testimony of the parties and their former attorneys concerning their interpretations of the Settlement Agreement because this evidence provided context to the Settlement Agreement and informed, rather than contradicted, the terms of the agreement, which are permissible uses for parol evidence. We disagree.

During trial, Carolyn and her former attorney testified that the Brookes Baker Survey—which was also admitted into evidence—had been completed prior to execution of the Settlement Agreement and that the way that survey divided the Marble Falls Property into two tracts formed the basis of the "West 50%" and "East 50%" language in the Settlement Agreement. Carolyn's former attorney agreed, however, that the Settlement Agreement did not refer to the Brookes Baker Survey and the survey was not attached as an exhibit to the Settlement Agreement or otherwise incorporated by reference into the agreement. Mary and her former attorney testified that, although they were aware of the Brookes Baker Survey prior to signing the Settlement Agreement, Mary did not agree with how that survey

proposed division of the property and, if that survey had formed the basis of how the property was to be divided, Mary would not have signed the Settlement Agreement. And Carolyn testified that she herself divided the Marble Falls Property based on the Brookes Baker Survey after the sisters entered into the Settlement Agreement.

Question Number One of the jury charge asked, "Did Carolyn and Mary agree to divide the Marble Falls 60 acres pursuant to the Survey?" The charge defined "Survey" as the Brookes Baker Survey. This question included the following instructions: "You must decide the intent of the parties at the time of the Settlement Agreement. Consider all the facts and circumstances surrounding the making of the Settlement Agreement, the interpretation placed on the Settlement Agreement by the parties, and the conduct of the parties." The jury answered "yes" to this question.

When a contract is unambiguous, courts "may still consider the surrounding 'facts and circumstances'" in which the agreement was made, "but 'simply [as] an aid in the construction of the contract's language.'" *First Bank*, 519 S.W.3d at 110 (quoting *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). The parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Id.* (quoting *Houston Expl.*, 352 S.W.3d at 469). Courts may *not* use extrinsic evidence, however, to show "that the parties probably meant, or could have meant, something other than

32

what their agreement stated." *Id.* (quoting *Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451). As the Texas Supreme Court has stated:

> Parties cannot rely on extrinsic evidence to "give the contract a meaning different from that which its language imports," "add to, alter, or contradict" the terms contained within the agreement itself, "make the language say what it unambiguously does not say," or "show that the parties probably meant, or could have meant, something other than what their agreement stated."

*URI*, 543 S.W.3d at 769 (internal citations omitted).

Here, the Settlement Agreement instructed Carolyn, as trustee of the trust that owned the Marble Falls Property, to divide the Property into two tracts, east and west, of equal value. It made no reference to the Brookes Baker Survey, and that survey was not attached as an exhibit to or incorporated into the Settlement Agreement. The trial court, however, allowed the parties and their former attorneys to testify concerning whether they agreed that the Marble Falls Property should be divided according to the Brookes Baker Survey. The use of parol evidence in this case went beyond using "objectively determinable" facts and circumstances, *see Houston Expl.*, 352 S.W.3d at 469, as "an aid in the construction of the contract's language." *See First Bank*, 519 S.W.3d at 110; *see also Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451 (stating that courts may consider surrounding circumstances "in determining the parties' intent *as expressed in the agreement*" but cannot use extrinsic evidence to show parties probably meant something other than what agreement stated). Instead, the jury heard evidence of Carolyn's subjective intent

that the division of the Marble Falls Property into a "West 50%" tract and an "East 50%" tract would occur pursuant to the division set out in the Brookes Baker Survey. *See URI*, 543 S.W.3d at 769–70 ("Even though the contract admits no ambiguity, the lower courts engrafted limitations that are entirely external to the instrument and directed to fulfilling Kleberg County's unexpressed subjective intent. This is not a proper use of surrounding facts and circumstances. '[C]ourts cannot rewrite the parties' contract or add to or subtract from its language.'") (quoting *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016)).

Moreover, the jury was ultimately asked to determine whether Carolyn and Mary agreed to divide the Marble Falls Property pursuant to the Brookes Baker Survey, even though the relevant contract—the Settlement Agreement—said nothing about the survey, and Mary and her former counsel disputed Carolyn's claim that there had ever been an agreement between the sisters to divide the Property in accordance with that survey. The survey was not included in the exhibits attached to the Settlement Agreement, and Carolyn, the trustee of the trust that owned the Property, testified that she divided the property according to the Brookes Baker Survey *after* the Settlement Agreement had been signed. Thus, in this case, parol evidence was used not as an aid to interpret language in the contract, but instead to add terms to the unambiguous Settlement Agreement that were not included in that contract and were even contrary to its plain language. *See Barrow-Shaver Res.*, 590

34

S.W.3d at 479 (stating that, when construing contract, we look to language of parties' agreement); *Great Am. Ins.*, 512 S.W.3d at 893 ("A contract's plain language controls, not 'what one side or the other alleges they intended to say but did not.'"). This is an impermissible use of parol evidence. *See Barrow-Shaver Res.*, 590 S.W.3d at 483; *URI*, 543 S.W.3d at 769–70; *First Bank*, 519 S.W.3d at 110 ("In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous language, circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say.") (internal citation omitted).

We conclude that, because the language of the Settlement Agreement is unambiguous, the trial court—and not the jury—should have determined the parties' intent as a matter of law, "and it could not do so by relying on extrinsic evidence to create an intent that the contract itself does not express." *See First Bank*, 519 S.W.3d at 110. We therefore hold that the trial court reversibly erred by ruling that the Settlement Agreement was ambiguous, admitting and instructing the jury to consider parol evidence concerning whether the parties intended to divide the Marble Falls Property according to the Brookes Baker Survey, and submitting Question Number One to the jury.

We sustain Mary's first issue.

## Specific Performance

In her second issue, Mary contends that the trial court erred by awarding specific performance of the Settlement Agreement to Carolyn when she did not obtain jury findings on the essential elements of specific performance. Specifically, she argues that Carolyn failed to obtain jury findings that (1) she tendered her own performance and (2) that she was ready, willing, and able to perform "at all times relevant to the contract and thereafter."

Specific performance is an equitable remedy that may be awarded upon a showing of breach of contract. *Ifiesimama v. Haile*, 522 S.W.3d 675, 685 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied). Specific performance is not a separate cause of action but is instead an equitable remedy that is used as a substitute for monetary damages when such damages would not be adequate. *Ifiesimama*, 522 S.W.3d at 685; *Stafford*, 231 S.W.3d at 535. To be entitled to the remedy of specific performance, the plaintiff must show that she has substantially performed her part of the contract and that she is able to continue performing her part of the agreement but that the other party has breached the contract. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 594 (Tex. 2008); *Ifiesimama*, 522 S.W.3d at 685. "The plaintiff's burden of proving readiness, willingness and ability [to perform] is a

36

continuing one that extends to all times relevant to the contract and thereafter." *DiGiuseppe*, 269 S.W.3d at 594. "The party seeking specific performance must show that [she] has complied with [her] obligations under the contract." *Ifiesimama*, 522 S.W.3d at 685; *see DiGiuseppe*, 269 S.W.3d at 594 ("It is also a general rule of equity jurisprudence in Texas that a party must show that he has complied with his obligations under the contract to be entitled to specific performance."). As a general rule, the party seeking specific performance must actually tender performance as a prerequisite to obtaining this remedy. *Ifiesimama*, 522 S.W.3d at 685–86. For specific performance to be awarded, the fact-finder must find that the defendant has breached a contract. *Ifiesimama*, 522 S.W.3d at 690.

Here, the jury charge asked multiple questions relating to breach of the Settlement Agreement. Question Number One asked whether Carolyn and Mary agreed to divide the Marble Falls property "pursuant to the Survey." The jury answered "yes" to this question. Question Two asked whether Carolyn—who divided the Property according to the Brookes Baker Survey—failed to comply with the Settlement Agreement "with respect to the Marble Falls 60 acres." The jury answered "no" to this question. Question Four asked whether Mary failed to comply with the Settlement Agreement "with respect to the 'Agreed Order of Dismissal'" and Question Five asked whether Mary's failure to comply was excused. The jury answered that Mary failed to comply with the Settlement Agreement and that her

failure was not excused. Because the jury found that Carolyn did not fail to comply with the Settlement Agreement, the jury did not answer Question Six, concerning who failed to comply with the Settlement Agreement first. The jury charge did not include questions on whether either Carolyn or Mary was ready, willing, or able to perform under the contract.

The jury questions on breach of contract, particularly the questions concerning whether Carolyn breached the Settlement Agreement, are related to Question One, whether the sisters agreed to divide the Property pursuant to the Brookes Baker Survey. We have held, however, that the trial court erred in its submission of this question to the jury. Because we hold that the issue of breach of the Settlement Agreement must be retried, and specific performance is an equitable remedy for breach for contract, we likewise reverse the trial court's judgment awarding Carolyn specific performance of the Settlement Agreement.

We sustain Mary's second issue.[6]

---

[6] Because we hold that the trial court erred in submitting the breach of contract issue to the jury and remand this case for a new trial, Carolyn is no longer a prevailing party entitled to attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (providing that person may recover reasonable attorney's fees "in addition to the amount of a valid claim and costs" if claim is for written contract). We therefore do not address Mary's third issue—whether the trial court erred in awarding Carolyn her unsegregated attorney's fees.

## Conclusion

We reverse the judgment of the trial court and remand this case for further proceedings consistent with this opinion.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Lloyd, and Landau.